# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION
## CASE NO. 5:07-CV-00048-BO

| | | |
|---|---|---|
| Muangmol Asanok, Bunthom Fakthaisong, Manat Inthirit, Waeo Kaewsang, Sonthaya Kamonkhorn, Worawut Khansamrit, Jaroon Kitjakan, Chinnawat Kompeemay, Thongsuk Manichantha, Poochit Naentaisong, Suradet Phaengbutdee, Thana Phakhokthom, Bunmee Phaniphat, Montree Phothi, Pornpot Phromchuen, Suppachai Phromwong, Nathee Simluang, Somboon Teebnoidee, Surachai Wannasiri, Pradit Wiangkham, Narin Yiamcharoen, and Surachi Yot On, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | **AMENDED COMPLAINT** |
| vs. | ) ) | |
| Million Express Manpower, Inc., Seo Homsombath, Roy Raynor, Sombourne Chinlasith, Evans Farms, Inc., Harold Williamson, Million Express Manpower, Ltd., and Tsai Rong-Fa, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## I. PRELIMINARY STATEMENT

1. Plaintiffs came to the United States from Thailand as temporary foreign agricultural workers on H-2A visas. In Thailand, defendants promised plaintiffs they would have steady work on farms for three (3) years. Defendants charged plaintiffs more than eleven thousand dollars ($11,000) each to secure the promised employment. Plaintiffs, believing the United States to be the land of opportunity and willing to work hard to improve their families' futures,

believed the defendants' promises and raised the money to pay the defendants' charges by borrowing heavily, using their homes and small parcels of farmland in rural Thailand as security.

2.   Plaintiffs were victims of trafficking.   When they arrived in North Carolina, Defendant Million Express Manpower, Inc. confiscated their passports and visas.   Defendants did not provide plaintiffs with the promised work, and kept plaintiffs in seriously substandard housing.   Defendants warned plaintiffs they would be arrested if they left their employment, monitored their movements constantly, and showed plaintiffs that they possessed guns.   Plaintiffs were fearful of leaving the defendant employer, and also were bound to continue working to pay off the massive recruitment fees they had paid.   After Hurricane Katrina, defendants moved plaintiffs to New Orleans, Louisiana.   They housed plaintiffs in a condemned motel there, put plaintiffs to work under atrocious conditions, and failed to pay them for their work.   Plaintiffs eventually sought help and escaped.

3.   Plaintiffs seek to redress the wrongs they suffered, and bring claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), the Trafficking Victims Protection Act, ("TVPA"), 18 U.S.C. §§ 1581 et. seq., the Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961 et seq., and North Carolina common law.

4.   The plaintiffs seek damages, declaratory relief and injunctive relief, costs of the action and other appropriate relief.

## II.  JURISDICTION

5.   This Court has jurisdiction of this matter pursuant to: 28 U.S.C. § 1331 (Federal Question); 28 U.S.C. § 1337 (Interstate Commerce); 29 U.S.C. § 216(b) (FLSA); 18 USCS § 1595(a) (TVPA); 18 U.S.C. §1962 (RICO) and 28 U.S.C. § 1367 (Supplemental Jurisdiction). The court is empowered to make a declaratory judgment pursuant to   28 U.S.C. §2201 and

§2202. Venue is proper in this district pursuant to 28 U.S.C. §1391(b). Venue is also proper in this district pursuant to 18 U.S.C. §1965.

### III. PARTIES

6. Plaintiffs are citizens of Thailand, who came to the United States on temporary agricultural worker (H-2A) visas. They were employed by Defendants Million Express Manpower, Inc., Seo Homsombath, Roy Raynor, Sombourne Chinlasith, Evans Farms, Inc and Harold Williamson in the production of goods for interstate commerce. At all times, each of the plaintiffs constituted a person within the meaning of 18 U.S.C. 1961(3).

7. Defendant Million Express Manpower, Inc. ("Million USA") is a North Carolina corporation. It was founded by Defendants Seo Homsombath, Roy Raynor and Sombourne Chinlasith as a labor-brokering business. At all times pertinent to this action, Million USA was engaged in business in Johnston, Nash, and Wayne counties. Million USA is a registered farm labor contractor and employed the plaintiffs in the production of goods for interstate commerce. Million USA's labor brokering activities also affected interstate or foreign commerce. Defendant Million is a person within the meaning of 18 U.S.C. §1961(3). Defendant Million USA is subject to the jurisdiction of this Court.

8. Defendant Seo Homsombath is a resident of Johnston County, and a native of Laos. In 2004 and 2005, he was a registered farm labor contractor. He was the president of Defendant Million USA. As a principal of Million USA, Defendant Homsombath employed the plaintiffs or acted directly or indirectly in the interest of an employer towards the plaintiffs and was engaged in interstate commerce or in producing goods for interstate commerce. Defendant Homsombath's labor brokering activities also affected interstate or foreign commerce.

Defendant Homsombath is a person within the meaning of 18 U.S.C. §1961(3). Defendant Homsombath is subject to the jurisdiction of this Court.

9. Defendant Roy Raynor is a resident of Johnston County. Defendant Raynor was a principal of Million USA, and as such was engaged in interstate commerce or in producing goods for interstate commerce. Defendant Raynor's labor brokering activities also affected interstate or foreign commerce. Defendant Raynor is a person within the meaning of 18 U.S.C. §1961(3). Defendant Raynor is subject to the jurisdiction of this Court.

10. Defendant Sombourne Chinlasith is a resident of Springfield, Virginia. Upon information and belief, Defendant Chinlasith is a native of Laos. Defendant Chinlasith was a principal of Million USA, and as such employed the plaintiffs or acted directly or indirectly in the interest of an employer towards the plaintiffs and was engaged in interstate commerce or in producing goods for interstate commerce. Defendant Chinlasith's labor brokering activities also affected interstate or foreign commerce. Defendant Chinlasith is a person within the meaning of 18 U.S.C. §1961(3). Defendant Chinlasith is subject to the jurisdiction of this Court.

11. Defendant Evans Farms, Inc. is a North Carolina corporation operated by Floyd Andy Evans in Wayne County. At all times pertinent to this action, Defendant Evans Farms, Inc. was engaged in the production of goods for interstate commerce and employed the plaintiffs or acted directly or indirectly in the interest of an employer towards the plaintiffs. Defendant Evans Farms, Inc. is subject to the jurisdiction of this Court.

12. Defendant Harold Williamson operates a farm located in Wayne County. At all times pertinent to this action, Defendant Williamson was engaged in the production of goods for interstate commerce and employed the plaintiffs or acted directly or indirectly in the interest of

an employer towards the plaintiffs. Defendant Williamson is subject to the jurisdiction of this Court.

13. Defendant Million Express Manpower, Ltd. ("Million Thailand") is a company located in Bangkok, Thailand that recruits Thai workers for overseas employment. Defendant Million Thailand acted as the agent for defendant Million USA, its principals in recruiting plaintiffs for employment in North Carolina, helping plaintiffs to obtain H-2A visas, handling paperwork, and arranging transportation for plaintiffs from Thailand to North Carolina, activities which affect interstate or foreign commerce. Defendant Million Thailand is a person within the meaning of 18 U.S.C. §1961(3). Defendant Million Thailand is subject to the jurisdiction of this Court.

14. Defendant Tsai Rong-Fa was, at all times pertinent to this action, a key officer, employee and agent of Million Thailand. Defendant Tsai Rong-Fa is a native of Taiwan and, upon information and belief, resides in Bangkok, Thailand. Plaintiffs transferred the majority of their recruitment fees directly to the bank account of Defendant Tsai Rong-Fa. Tsai Rong-Fa's labor brokering activities also affected interstate or foreign commerce. Defendant Tsai Rong-Fa is a person within the meaning of 18 U.S.C. §1961(3). Defendant Tsai Rong-Fa is subject to the jurisdiction of this Court.

## IV. STATEMENT OF FACTS

### A. Premises of the H-2A Program

15. A "guestworker" program for seasonal farmworkers exists under current U.S. immigration law. This program is known as the "H-2A" program and is codified at 8 U.S.C. §1181(h)(ii)(a).

16. Employers seeking to hire H-2A workers must first apply to the U.S. Department of Labor's Employment and Training Administration (ETA) for a certification that 1) there are not enough workers in the United States ready and able to take the jobs, and 2) the conditions offered for the jobs do not adversely affect other farmworkers in the United States.

17. Under the statute and the regulations promulgated by the Secretary of Labor, employers desiring to employ H-2A workers must provide certain benefits, including an hourly wage set by the Secretary of Labor each year, known as the Adverse Effect Wage Rate (AEWR), free housing which meets all applicable federal, state and local housing codes, free transportation to and from the worksite, free work tools, worker's compensation, itemized pay statements, and a minimum of three-fourths (3/4) of the hours of work promised on the job order ("the three-quarter guarantee").

18. An employer files two (2) forms in order to get certification, the ETA 750 ("Application for Alien Employment Certification") and the ETA 790 ("Agricultural and Food Processing Clearance Order"). The ETA 790 is attached to and incorporated by reference and by operation of law into the ETA 750. Hereinafter, these two forms combined will be referred to as "the clearance order."

19. If ETA approves the clearance order and certifies the employer's need for H-2A workers, the employer may file a petition with U.S. Citizenship and Immigration Services ("USCIS") seeking approval for H-2A visas for the prospective employees s/he names in the petition. After the petition is approved, officials of the U.S. Consular Service of the U.S. Department of State schedule those persons for interviews at a U.S. consulate in their home country. If the consular officials find these individuals meet the eligibility requirements for H-2A visas imposed by immigration law (i.e., they are not intending to immigrate to the U.S.

permanently, have never been deported, etc.), the workers are issued temporary non-immigrant agricultural (H-2A) visas for the period specified in the ETA certification.

20.  Under the law and regulations, H-2A visas are only for seasonal agricultural work and are of less than one (1) year in duration.

21.  The ETA handbook on H-2A certifications contains specific instructions regarding farm labor contractors who file clearance orders for H-2A workers, noting, "The H-2A program and the implementing regulations are primarily constructed for the use of employers who own and/or operate a fixed-site establishment . . . However, . . . bona fide registered farm labor contractors may be eligible to apply for and receive H-2A certification." ETA Handbook No. 398, II-24 (1988).

22.  Farm labor contractors have a history of labor violations and economic insolvency. Therefore, the ETA Handbook instructs that state job service and ETA staff should "be careful to look behind any applications filed by farm labor contractors" to ensure that the contractor is operating by the federal statutes regulating farm labor contractors, and that the jobs in the clearance order are genuine and that "the conditions associated with them comply with applicable laws and regulations." ETA Handbook No. 398, II-25 (1988).

**B.  Defendants Start Million USA to Abuse the H-2A Visa Program for Personal Gain**

23.  About 2000, Defendant Homsombath's relative Southone "Aaron" Louangxonikone, began a farm labor contracting business to bring H-2A workers from Southeast Asia to work on North Carolina farms.  Defendant Homsombath became involved in Aaron's labor brokering business and went to Southeast Asia to recruit workers for him.

24.  Defendant Raynor, at the time, was an employee of the state job service, where his duties were to assist farmers in finding agricultural laborers, and assist crewleaders in finding

work for their crews. Through this work, Defendant Raynor met Aaron, and began to assist Aaron in making contacts with farmers who might need labor. Defendant Raynor also met Defendant Homsombath through Aaron.

25. Defendants Homsombath, Raynor, and Chinlasith founded Million Express Manpower, Inc. in 2003, to capitalize on 1) the need of many impoverished people in northern Thailand to get employment abroad in order to support their families; and 2) the desire of some North Carolina farmers to obtain H-2A workers more cheaply, and with less accountability, than if they made an application on their own behalf or used a more established H-2A labor provider.

26. Defendants Homsombath, Raynor, and Chinlasith each invested several thousand dollars in Defendant Million USA. They had an agreement to share the profits of the corporation.

27. Defendants Homsombath, Raynor, and Chinlasith failed to capitalize Defendant Million USA sufficiently to provide their employees all the benefits promised under contract and required by law.

28. Defendants Homsombath, Raynor, Chinlasith, made all the decisions for Defendant Million USA. Defendants Homsombath, Raynor and Chinlasith were alter egos of the corporation.

29. Upon information and belief, Defendant Million USA did not have any board of directors to oversee the decisions of Defendants Homsombath, Raynor, and Chinlasith. Corporate formalities were not followed.

30. Upon information and belief, no formal shareholder meetings were held for Defendant Million USA.

31.  Defendants Homsombath, Raynor, and Chinlasith each brought different skills and talents to Million USA.  Defendant Homsombath speaks Thai and is familiar with the economic situation in Thailand and the overseas labor recruitment system for sending Thai workers abroad. Defendant Homsombath was knowledgeable about farming in North Carolina, the crops grown and the need for hand labor in the various crops in eastern North Carolina.

32.  Defendant Raynor, through his position with the state job service, became familiar with the process of licensing farm labor contractors.  He registered Defendants Homsombath, Chinlasith and Million USA as farm labor contractors.  Defendant Raynor presented himself as knowledgeable about the H-2A program.  Through his work with the job service, Defendant Raynor also knew many North Carolina farmers in need of hand labor.  Because of his upbringing in Johnston County, Defendant Raynor was also knowledgeable about farming in North Carolina, the crops grown and the need for hand labor in the various crops in eastern North Carolina.

33.  Defendant Chinlasith speaks Thai and is familiar with the economic situation in Thailand and the overseas labor recruitment system for sending Thai workers abroad.

34.  Defendants Homsombath, Raynor and Chinlasith borrowed the name of Defendant Million Express Manpower, Ltd. (Million Thailand) in naming their business, Million Express Manpower, Inc. (Million USA).  Million Thailand is a well-known company in Bangkok, Thailand, which secures overseas employment for Thai workers.  Defendant Homsombath obtained permission from Million Thailand to use the same name for his corporation.

35.  Defendants Homsombath, Raynor and Chinlasith knew that labor recruiting firms in Thailand, such as Million Thailand, charged workers large sums to obtain employment abroad and that workers usually went deeply into debt in order to raise such sums.  Defendants intended

to make a substantial part of their profit from a share of the sums that the workers would pay to get the jobs. When advertising Million USA's services to growers, defendants touted the workers' debt as an advantage of the Thai workforce, because it greatly minimized the chance that workers would voluntarily leave their employment.

36. Defendants Homsombath, Raynor, and Chinlasith knew the requirements of the law governing the H-2A program, *inter alia*, that as an H-2A employer, Million USA would be required to provide free housing to its workers which complied with all applicable federal and state safety and health standards, reimburse workers their incoming transportation costs and pay the workers' way home at the conclusion of the contract, and pay the workers for three-fourths (3/4) of the promised hours of work should they fail to provide that amount of work.

37. Defendants Homsombath, Raynor, and Chinlasith intended Defendant Million USA not to comply with these requirements. Due to the high costs of bringing workers from Thailand, Defendants Homsombath, Raynor, and Chinlasith knew or should have known that if Defendant Million USA complied with these requirements, their business venture would fail.

38. Defendants Homsombath, Raynor, and Chinlasith used their control of the corporation to commit fraud or wrong. Defendants' control and breach of duty proximately caused the injury or unjust loss complained of by plaintiffs in this Complaint.


## C. Million USA Requests Government Approval to Hire H-2A Workers

39. During early 2005, Defendants Homsombath, Raynor and Chinlasith collectively decided to submit H-2A clearance orders for foreign labor. Under the name of Defendant Million USA, they submitted ten (10) agricultural clearance orders to the federal ETA. Each clearance order specified a grower with whom Defendant Million USA had contracted to provide

Case 5:07-cv-00048-BO   Document 49   Filed 08/24/07   Page 10 of 46

agricultural laborers. The terms and conditions of employment offered by Defendant Million USA in 2005 included a written assurance of compliance with all federal, state and local labor-related laws, as required by 20 C.F.R. § 655.103(b).

40. On each clearance order, Defendant Homsombath, as president of Million USA, signed the written assurance of compliance under penalty of perjury. He further swore under penalty of perjury as required by law, that:

    a. the job opportunity had been and was clearly open to any qualified U.S. worker;

    b. Million USA had sufficient funds available to pay the wages and salary offered to an alien; and

    c. the information contained in the ETA 750 was truthful.

41. Defendants Million USA, Raynor, Homsombath, and Chinlasith made false assurances in the 2005 clearance orders.

42. Defendants Million USA, Raynor, Homsombath, and Chinlasith knew the assurances were false at the time that Defendant Homsombath swore that the assurances were accurate.

43. Defendants did not intend to comply with the assurances sworn to in the clearance orders. Defendants Million USA, Raynor, Homsombath, and Chinlasith, through Homsombath's oath, deliberately misrepresented their intent to comply with federal, state and local laws because the ETA would not approve their application without the assurances.

44. In fact, Defendant Million USA did not have sufficient funds to pay the wages and salary offered and was dependent upon income from the farms in order to pay such wages and benefits.

45. In fact, Defendant Million USA and its principals did not intend to comply with all applicable federal, state and local employment-related laws, in that they did not intend to pay for workers' transportation, recruitment, and visa costs, as required by the Fair Labor Standards Act, or for workers' return transportation to Thailand at the conclusion of the visa, as required by the regulations implementing the H-2A program.

46. Further, the information contained in the clearance orders was false because it greatly overstated labor needs of each of the farms, both in terms of the number of workers needed, the period of employment, and the specific work that would be available.

47. Defendant Million USA was already not in compliance with the assurances they had made in prior similar clearance orders.

48. In fact, job opportunities were not clearly open to any qualified U.S. worker and Defendant Million USA had in fact denied job opportunities to qualified U.S. workers in 2004 and 2005.

49. Defendants Homsombath, Raynor, and Chinlasith planned to make money from offering visas for the jobs to impoverished workers in Thailand. Defendant Million USA's business model was based upon hiring only foreign H-2A workers.

50. ETA certified the clearance orders, allowing Defendant Million USA to obtain H-2A visas for the requested number of workers pending U.S. Department of State processing of the workers' visas.

51. These clearance orders listed Defendant Million USA as the employer and specified various growers at whose farms the workers were to be employed. *See Exhibit 1, attached (Exhibit 1 only includes the ETA 790; plaintiffs currently do not possess a copy of the ETA 750 for this order).*

52. ETA required Defendant Million USA to submit with each clearance order a signed statement from the grower on whose farm the work was to take place promising that he had work available during the period of the order.

53. Defendants Million USA and Homsombath also entered into written and oral contracts with other farms, including those of Defendants Evans Farms, Inc. and Williamson to provide them with workers. Defendants Million USA and Homsombath did not inform ETA that they would place workers on these other farms nor submit contracts or statements from those farms to ETA.

54. By operation of law, the clearance order constituted the approved H-2A contract ("H-2A Contract").

55. The H-2A Contract provided the following promises, among others:

    a.  plaintiffs would receive the Adverse Effect Wage Rate (AEWR) in effect at the time of the employment (the AEWR was $8.24 per hour by the time plaintiffs arrived in the U.S.);

    b.  plaintiffs would work in farm work;

    c.  work would be provided from May 1, 2005 through November 15, 2005;

    d.  forty (40) hours of work per week would be provided;

    e.  employment was guaranteed for a minimum of three-fourths (¾) of the work days of the total specified period during which the work contract was in effect (the "three-quarter guarantee");

    f.  payroll periods would be weekly;

    g.  workers would be provided with an earnings statement showing hours worked, total earnings, and deductions;

h.  employer would provide three (3) meals per day at a cost of $8.78 per day, and will provide "free and convenient cooking and kitchen facilities" for workers to prepare their own meals;

i.  housing would be located at the Dutch Inn in Benson, North Carolina, housing will be "clean and in compliance with OSHA Housing Standards when occupied", and housing and utilities would be provided at no cost to workers;

j.  after fifty percent (50%) of the contract, the employer would reimburse workers for the cost of transportation and subsistence from the place of recruitment; and

k.  if the employer had to terminate the contract for reasons beyond the control of the employer, or an act of God, the workers would receive any benefits due under the three-quarter guarantee from the first day after arrival to the date of termination and transportation home.

## D. **Recruitment of Plaintiffs in Thailand**

56.  Defendant Million USA authorized Defendant Million Thailand to recruit and hire Thai nationals for employment as H-2A agricultural workers with Million USA and the growers who were utilizing Million USA..

57.  Defendant Million Thailand recruited plaintiffs in Thailand in the spring of 2005. Million Thailand had their recruiters inform plaintiffs in their local villages about the availability of work in the United States with Defendant Million USA. Most plaintiffs had little education, and were from northeastern Thailand, which is a poor region of the country.

58.  Defendants Million Thailand and Million USA told plaintiffs that work would be available for three (3) years and that they would earn $8.24 per hour. Million Thailand also told

plaintiffs they would be required to pay a fee of approximately four hundred and fifty thousand (450,000) Thai baht to obtain the job. Based upon a reasonable calculation of their earnings in the United States in reliance upon defendants' promises, plaintiffs accepted the offer.

59. Defendants Million Thailand and Million USA prepared an additional written contract ("Employment Contract") containing terms and conditions of employment for plaintiffs' employment with defendants. Defendants, at some point before plaintiffs left Thailand, gave plaintiffs copies of the Employment Contract in Thai and in English. *See Exhibit 2a, attached.* The Thai version contained several provisions that were not translated in the English version that was provided to plaintiffs. *See Exhibit 2b, attached (English translation of Thai version of contract, translated by independent, qualified translator).* Many of the relevant terms of the Employment Contract are the same as those listed in the H-2A Contract. Additional contractual promises contained in the Employment Contract (*Exhibit 2a,2b)* include, among others:

    a. The duration of the contract was to be nine (9) months;

    b. "Safe and hygienic" housing would be provided;

    c. Defendant Million Thailand agreed to take "full responsibility" in repatriating the 'job seekers' (plaintiffs) as well as reimbursing the plaintiffs the paid service fee and expenses in any of the following situations:

        i. Job seeker arrives and finds no work;

        ii. Job seeker is paid less than the agreed-upon wages;

        iii. Job seeker is reassigned to a position other than that stipulated in the contract and does not wish to perform those duties;

        iv. Job seeker is not granted the agreed-upon benefits; or

        v. Job seeker's employment is prematurely terminated

d. If Employer (listed as Million USA) terminated the contract, it was required to give one (1) month notice to plaintiffs or pay one (1) month's wages in lieu of giving notice and to pay cost of return travel to Thailand;

e. The employer was obligated pay "all necessary fees and expenses incurred on the acquisition of the work permit on the employee's behalf in accordance with local regulations";

f. If the employer "fails to comply with any terms or conditions agreed upon in this contract, either in full or in part, the employer shall be responsible for any losses incurred to the employee."

60. Defendants Million Thailand, its president, Tsai Rong-Fa, Million USA, and its principals Homsombath, Raynor, and Chinlasith, knew that the Employment Contract specified nine (9) months of employment, not three (3) years as promised orally. These defendants also knew that H-2A visas issued by the U.S. government are only issued for a period of less than one (1) year.

61. Relying on the promises made by Defendants Million Thailand and Million USA, plaintiffs made arrangements to pay the defendants' required fee.

62. Plaintiffs paid their own expenses to travel between their home villages and Bangkok on several occasions to apply for the job, to apply for the visa, and other trips to fill out paper work and attend trainings. On some occasions, overnight stays were required.

63. Initially, each plaintiff paid a down payment of fifty thousand (50,000) baht. Many plaintiffs had to borrow even the down payment. Plaintiffs took out loans of up to five hundred thousand (500,000) baht to pay the recruiting, visa, and transportation fees charged by defendants. Lenders charged plaintiffs steep rates of interest for the loans they gave them.

64. Most plaintiffs used their homes and small agricultural plots and/or those of their extended families to act as collateral for the debt. Defendant Million Thailand provided a letter to money lenders explaining that plaintiffs had obtained employment in the United States, and asking money lenders to make loans based on that fact.

65. In June 2005, employees of Defendant Million Thailand escorted plaintiffs to the U.S. Embassy in Bangkok to apply for H-2A visas. Thai law prohibits overseas labor recruiters from charging fees as high as those charged by Defendants. Employees of Defendant Million Thailand instructed plaintiffs to tell the U.S. consular officials that their charges were no more than fifty thousand (50,000) Thai baht, and further instructed plaintiffs that they should not inform the U.S. consular officials they were required to pay any more than that in fees to Million Thailand.

**E.  Defendants Coerce Plaintiffs into Accepting Increased Demands**

66. In late August of 2005, defendants summoned plaintiffs to Bangkok for final preparations for the trip to the U.S.

67. Defendant Homsombath, and the President of Defendant Million Thailand, Defendant Tsai Rong-Fa, met with the plaintiffs as a group at the Million Thailand office. Defendants informed the plaintiffs that each had to pay an additional one hundred thousand (100,000) baht fee. They told the group that another group of workers had left Million USA so they needed the additional fee as "security" to ensure that the plaintiffs did not "escape."

68. All of the plaintiffs had exhausted their available sources of credit and had no way to pay the additional fee.

69. Defendants knew that plaintiffs lacked the ability to pay more and made this demand in order to increase control over plaintiffs and further their trafficking scheme.

70. Plaintiffs protested that they could not pay more. Some asked if they could rescind the agreement and receive a refund.

71. Defendants told plaintiffs they would not refund the fees already paid.

72. Defendants, knowing the plaintiffs needed prolonged overseas employment to make their commitment worthwhile, reassured plaintiffs that the visas were renewable and that work would be available for three (3) years.

73. Defendants suggested that, in lieu of paying the additional fee, plaintiffs sign an agreement allowing Defendant Million USA to:

    a. retain plaintiffs' passports throughout plaintiffs' time in the U.S;

    b. withhold one-hundred dollars ($100) per month from plaintiffs' pay; and

    c. charge plaintiffs two-thousand U.S. dollars ($2,000) if plaintiffs escaped from employment with defendants.

74. Plaintiffs, who fully intended to comply with their contract and had no way to recoup the fees they had already paid without overseas employment, were coerced into signing this document in order to retain employment with defendants.

75. Before departure from Thailand, each plaintiff paid a total of four hundred and fifty thousand (450,000) Thai baht (over $11,000 U.S. dollars) in fees to Million Thailand.

76. Million Thailand required the funds to be deposited directly into the bank account of its president, Defendant Tsai Rong-Fa.

77. Plaintiffs departed to the U.S. on August 25, 2005. Million Thailand officials transported them to the Bangkok airport, where plaintiffs received their passports with their H-2A visas for the first time. Expenses for this trip were paid by plaintiffs as part of their four hundred and fifty thousand (450,000) Thai baht fee paid to Defendant Million Thailand.

**F. Plaintiffs Arrive in North Carolina and Encounter Poor Conditions**

78.   Shortly after plaintiffs arrived in North Carolina, Defendant Homsombath confiscated plaintiffs' passports, visas and return airplane tickets.  Defendant Homsombath also required plaintiffs to sign documents ostensibly stating that plaintiffs had been reimbursed for their costs of travel from Bangkok to Raleigh.  Homsombath represented to plaintiffs that they were required to sign this document, or Defendant Million Thailand would not reimburse them.

79.   Despite plaintiffs' signature on that document, plaintiffs were never reimbursed for their transportation and subsistence during their journeys from their home villages to their place of employment in North Carolina nor for their confiscated return ticket.

80.   Plaintiffs initially were employed in farm work in North Carolina by Defendants Evans Farms, Inc. and Williamson.  Defendants Million USA and Homsombath or his agents transported plaintiffs to work at which agents of Defendants Evans Farms, Inc. and Williamson supervised the plaintiffs at the farms.

81.   Upon information and belief, Defendants Million USA and Homsombath also took plaintiffs to work at other farms, but Plaintiffs are unsure of the identity of the owners of most of those farms.

82.   Plaintiffs quickly learned that conditions would not be as they had been promised when they were recruited in Thailand.  Defendants did not provide the steady work promised to plaintiffs; many weeks less than forty (40) hours were provided.   On many days, a significant number of the plaintiffs were not provided any work by the defendants.

83.  Defendant Million USA initially housed plaintiffs in a motel, three (3) workers per room.  After a few weeks, Defendant Million USA moved plaintiffs into fewer rooms, so that as many as five (5) workers lived in a room.  Defendant Million USA also terminated the lease of the motel kitchen and forced plaintiffs to cook and eat all meals on the grounds of Defendant Homsombath's personal residence, about five (5) miles away. Eventually, all the plaintiffs were required to live in outbuildings behind Homsombath's personal residence, sharing one bath and with many workers sleeping on the floor.

84.  Defendant Homsombath also began to reduce food rations after a few weeks, leaving plaintiffs hungry.

85.  Throughout plaintiffs' stay in North Carolina, Defendant Homsombath restricted plaintiffs' movements and warned plaintiffs that they would be arrested and deported if they escaped from him.  Defendant Homsombath and his family members attempted to prevent plaintiffs from speaking with anyone else who spoke their language.  Homsombath and his family kept close watch over the plaintiffs to enforce their isolation.

86.  On several occasions, Defendant Homsombath and his son displayed guns to plaintiffs, causing plaintiffs to fear for their safety.

87.  Defendants deceived the government about the work, wages, and working and living conditions they would provide to workers in order to obtain H-2A visas.   Defendants deceived the plaintiffs in Thailand with false promises of work and wages, causing plaintiffs to incur enormous debts to pay their fees.

88.  Defendants, through physical and non-physical restraints, caused plaintiffs to feel afraid to leave their employment.

89.  Defendants Million USA, Homsombath, Million Thailand, and Tsai Rong-Fa saddled the plaintiffs with massive debt, confiscated and retained plaintiffs' passports and return airplane tickets, enforced the isolation of the plaintiffs, made warnings and threats to plaintiffs, and otherwise engaged in a scheme, plan, or pattern by which the defendants intended to cause the plaintiffs to believe that, if they did not perform labor for defendants, they would suffer serious harm.

## G.  Work in New Orleans and Escape from Million USA

90.  While plaintiffs remained willing and available to work in agriculture as promised by their contracts, in mid-October 2005, less than two months after plaintiffs' arrival, Defendant Homsombath told plaintiffs that no further work was available in North Carolina.

91.  Defendant Homsombath told plaintiffs he would provide work doing hurricane reconstruction in New Orleans.  Because of Defendant Homsombath's total control over plaintiffs, frequent threats to plaintiffs against leaving their employment, and because of plaintiffs' crushing debt burden from the loans they had taken to pay the defendants' fees, plaintiffs feared serious harm if they did not continue to labor for Defendant Million USA.

92.  In mid-October, Defendant Homsombath transported plaintiffs to New Orleans in several groups, where he put plaintiffs to work demolishing interiors of ruined motels and restaurants in the aftermath of Hurricane Katrina.

93.  Throughout plaintiffs' time in New Orleans, defendants harbored plaintiffs in several storm-damaged hotels.  The condition of the hotels worsened; the last hotel in which defendants harbored the plaintiffs was condemned.  This hotel had no electricity or hot water, was heavily damaged by flooding, and was filled with debris and mold.  The water from the tap was not

potable. Plaintiffs had to cook in the hallway on the portable propane stove they previously used in North Carolina, and had no choice but to use the contaminated water to cook.

94. During plaintiffs' time in New Orleans, Defendant Million USA had an agent known as "Louang" supervise plaintiffs at all times of the day and night. Upon information and belief, "Louang" is the same Southone "Aaron" Louangxonikone referred to in paragraph 23 of this Complaint. Louang warned plaintiffs against leaving the condemned hotel, saying they could be either arrested or attacked by criminals. He instructed plaintiffs to keep the curtains closed, not use candles, and not make noise at night. He also reiterated Defendant Homsombath's warnings to plaintiffs that they would be arrested if they left their employment with Defendant Million USA.

95. Defendant Homsombath also gave a gun to Louang, and told him to shoot any outsiders who came to the hotel. Louang kept the gun with him at the hotel throughout plaintiffs' stay. Because of these actions and representations and the dire situation in the city in general, with the National Guard patrolling the streets, plaintiffs were extremely fearful throughout their time in New Orleans that they would be arrested or harmed if they left Defendant Million USA.

96. Plaintiffs were not paid for the work they performed for defendants in New Orleans. Louang charged the plaintiffs for buying food for them. With no pay, the plaintiffs could not buy enough food and suffered from hunger.

97. On or about November 7, 2005, Defendant Homsombath took most of the plaintiffs back to North Carolina, ostensibly because officials of the Embassy of Thailand had contacted Homsombath and wanted to talk to the workers.

98.  Seven (7) of the plaintiffs remained in New Orleans because there was no room for them in the vehicle to travel to North Carolina. A few days later, these seven (7) plaintiffs received an offer of assistance from a social services agency to help them escape their situation in New Orleans.  Because of the extremely poor living and working conditions, and lack of pay, the plaintiffs accepted this offer.  When Louang was temporarily away from the hotel, a local non-profit employee assisted these seven (7) plaintiffs to escape.

99.  The other plaintiffs journeyed back to Benson, North Carolina, where they were again housed in the outbuildings behind Defendant Homsombath's residence.  On or about November 10, 2005, officials from the Embassy of Thailand met with them there, but did not offer assistance.

100.  The evening after the meeting with the officials from the Thai Embassy, Defendant Homsombath left his son, Scott, to watch over the plaintiffs staying on his property.  Scott displayed a gun to plaintiffs and told them that he would shoot anyone who came to try to help them escape.

101.  The following morning Scott Homsombath temporarily left the residence and plaintiffs were able to escape.

102.  After plaintiffs escaped, some of their families in Thailand received threatening telephone calls from Defendant Million Thailand in which Million Thailand warned of trouble if plaintiffs did not  return to work for Defendant Million USA.

103.  In January of 2006, after several demands from plaintiffs' counsel, Defendant Homsombath returned plaintiffs' passports.

**H. Facts Related to Defendants' Racketeering Activity**

Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-103.

104. Defendants Million USA, Homsombath, Raynor, Chinlasith, Million Thailand, and Tsai Rong-Fa ("The RICO defendants") derived substantial economic proceeds and profits from the pattern of racketeering activity alleged in this complaint.

105. The RICO Defendants violated §1962(c) of the RICO Act which requires, specifically:

      a.  conduct of or participation in

      b.  an enterprise

      c.  through a pattern

      d.  of racketeering activity and

      e.  injury incurred as a result of the underlying racketeering conduct.

106. The RICO Defendants engaged in racketeering activity as part of a common shared purpose of profiting by inducing Thai workers to pay exorbitant sums on the false promise of long-term, legal employment in the United States, and through labor trafficking under the auspices of the federal H-2A program ("Thai Labor Scheme").

107. The RICO Defendants, themselves and through key officers employees and agents, participated in the operation and management of the enterprise itself and violated United States laws.

108. Defendants Million USA, Homsombath, Raynor and Chinlasith violated 18 U.S.C. §1546 (visa fraud).

109. Defendants Million USA, Million Thailand, Homsombath, and Tsai Rong-Fa violated 18 U.S.C. §1589 (trafficking/forced labor) and 18 U.S.C. §1592 (confiscation of documents in furtherance of trafficking).

### 1. Enterprise

110. At all relevant times hereto, pursuant to written and oral agreements between and among the RICO Defendants as well as through their course of conduct, defendants have formed an associated-in-fact enterprise within the meaning of 18 U.S.C. §1961(4) for the purpose of committing numerous acts of racketeering activity, including visa fraud, forced labor, and confiscation of documents in furtherance of trafficking. Defendants Evans Farms, Inc. and Williamson, while not RICO Defendants, and the other contracting growers listed in Paragraph 142 of this Complaint were passive instruments associated in fact with the enterprise. The RICO Defendants along with other contracting employers listed in paragraph 142 of this Complaint comprise the Enterprise, "MilEx Enterprise."

111. Defendants Homsombath, Raynor and Chinlasith used their positions as partners and operators of Defendant Million USA and formed ongoing associations with the other members of the MilEx Enterprise in order to execute essential aspects of the Thai Labor Scheme.

112. Defendant Tsai Rong-Fa used his position as an officer and operator of Defendant Million Thailand and formed ongoing associations with the other members of the MilEx Enterprise in order to execute essential aspects of the Thai Labor Scheme.

113. The RICO Defendants are ongoing business entities associated in fact that had been in business prior to the facts which give rise to this case. Defendants Million USA and Million Thailand facilitate the provision of H-2A labor to agricultural employers in the United States. In

addition, Defendant Million Thailand provides temporary labor from Thailand to other nations outside of the United States.

114.   The RICO Defendants fraudulently obtained visas, or trafficked plaintiffs, or confiscated documents in furtherance of trafficking, or otherwise injured plaintiffs through their continuing associations.

115.   The RICO Defendants knowingly and recklessly participated in the operation and management of the MilEx Enterprise by directing the activities and managing the flow of information within the enterprise in order to perpetrate and advance the Thai Labor Scheme.

116. The MilEx Enterprise affected interstate commerce in that the RICO Defendants traveled in international and interstate commerce in order to reach the job promised in North Carolina. The MilEx Enterprise affected interstate commerce in a variety of ways, including, but not limited to, use of the interstate job order clearance system which posted the job offer contained in the clearance orders for purposes of recruiting U.S. workers as required by the H-2A regulations at 20 C.F.R. §655.106(e) and by directly engaging in the production, distribution and acquisition of goods and services in interstate commerce.

## 2.  Pattern of Racketeering Activity

117.   The RICO Defendants are engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

118. The pattern of racketeering activity engaged in by the RICO Defendants consists of more than two (2) acts of racketeering activity, the most recent of which occurred within ten (10) years of the commission of the prior racketeering acts.

119. Defendant Million USA filed clearance orders on behalf of various grower employers for the 2004 season which contained similar misrepresentations and false assurances

as those set forth above. In 2005, Defendants Million USA, Homsombath, Raynor, and Chinlasith submitted several clearance orders containing similar false representations and seeking hundreds of foreign workers through similar methods and with similar results.

120. The RICO Defendants saw the H-2A program as an opportunity to perpetrate their Thai Labor Scheme. In order for the Thai Labor Scheme to be successful, it was imperative that U.S. workers be prevented from filling the available positions. The RICO Defendants could earn far more money by hiring foreign workers than by hiring Americans. The RICO Defendants were aware of the exorbitant recruitment fees frequently paid by Thai persons seeking to work abroad, and intended to profit by charging similar, exorbitant fees.

121. During 2004, when U.S. worker applicants would seek employment through the job service for work under Million USA order NC7250251, Defendant Million USA improperly deterred and rejected the U.S. workers through false experience requirements and inappropriate demands.

122. In or around June 2004, Defendant Million USA improperly rejected U.S. workers for not having experience harvesting Asian vegetables despite the fact that there was no experience requirement on the clearance order.

123. Defendant Million USA later improperly required four U.S. worker applicants to meet non-existent job requirements prior to hire.

124. These incidents were not isolated, but constitute a continuing course of related conduct that violates U.S. immigration laws.

125. The RICO Defendants have used the same or similar methods of commission in that they continually exploited the federal H-2A program to reach its victims.

126.  The RICO Defendants have been consistent participants during the racketeering alleged in this complaint from the beginning.

127.  Consistently the primary intended victims of these predicate acts have been Thai nationals with no recourse outside the context of this litigation and brought into this country utilizing a pattern of illegal conduct alleged herein.

128.  The common shared purpose of the racketeering activity was to economically benefit the defendants at the expense of the plaintiffs.

129.  The racketeering acts are interrelated in that, without the visa fraud, Defendants Million USA, Million Thailand, Homsombath and Tsai Rong-Fa could not have successfully forced plaintiffs to labor.

130.  The racketeering acts committed by the RICO Defendants are otherwise related by distinguishing characteristics, including but not limited to the type of false statements made to Plaintiffs and other Thai labor and made to government officials, the use of similar methods of control over the workforce including but not limited to the taking of passports, and the ongoing obstruction of U.S. workers seeking employment.

131.  The multiple acts of racketeering activity by the defendants, as described along with the 2005 events set forth above, were related to each other and amounted to or posed a threat of continued racketeering activity, thus constituting a pattern of racketeering activity as defined by 18 U.S.C. §1961(5).

### 3.  Racketeering Activity

132.  Defendants Homsombath, Raynor, and Chinlasith, devised and incorporated Million USA, a corporation to engage in farm labor contracting of H-2A workers.  Defendant Million

USA was also used for submitting fraudulent clearance orders under the guise of a labor recruitment company.

133.  Defendants Million USA, Homsombath, Raynor and Chinlasith submitted orders for more workers than were actually needed in exchange for unlawfully high recruitment fees paid by Thai laborers to whom defendants fraudulently promised a visa to work lawfully in the U.S. for three (3) years.

134.  Defendants Million USA contracted with individual growers who claimed to need a specific number of foreign workers for a specific period of time.  The growers, upon information and belief, were passive instruments of the Thai Labor Scheme.

135.  Defendants Million USA and its officers coordinated with Defendant Million Thailand and its officers to charge Thai workers over eleven thousand dollars ($11,000) per person for recruitment fees and transportation to the U.S.  These proceeds were divided among RICO Defendants.

136.  Defendants Million USA, Homsombath, Raynor, and Chinlasith expected earnings through the fees they would charge to employers for use of the Thai laborers, by underpaying workers for the work they performed, and by requiring workers to purchase food and other necessities from them at inflated prices.

137.  In addition to his share of the recruitment fees and profits, Defendant Raynor expected to be paid twelve hundred dollars ($1200) per worker for his participation in the Thai Labor Scheme.

138.  In May 2005, Defendant Raynor traveled to Thailand.  He obtained a cash payment of eighteen thousand dollars ($18,000) as partial payment for his participation in the Thai Labor Scheme.

## 4.  Predicate Act:  Visa Fraud – 18 U.S.C. §1546

Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-138.

139. Defendants Million USA, Homsombath, Raynor, and Chinlasith knowingly made an oath which they knew to be false at the time, containing a false statement of a material fact in a document required by the immigration laws.

140.  The RICO Defendants' Thai Labor Scheme was dependent on obtaining approval to employ H-2A workers. In order to obtain these visas, the RICO Defendants collectively decided to apply for H-2A visas using growers as unwitting participants in this scam.

141.  Defendants Million USA, Homsombath, Raynor, and Chinlasith collectively prepared and executed the following clearance orders in or around January or February, 2005:

    a.   R3 05047 02269 (Howell Farms – 25 positions for 40 hours of work per week in tobacco and cucumbers from 4/15/05 to 11/15/05)

    b.   R3 05055 02419 (Neil Hill Farms – 30 positions for 40 hours of work per week in tobacco and cucumbers from 5/1/05 to 11/15/05)

    c.   R3 05055 02417 (Jarvis McDonald – 40 positions for 40 hours of work per week in tobacco and cucumbers from 5/1/05 to 12/31/05)

    d.   R3 05047 02279 (Tim Parker Farms – 10 positions for 40 hours of work per week in sweet potatoes, tobacco, and cucumbers from 4/15/05 to 12/31/05)

    e.   R3 05047 02275 (Gerald Coggins – 35 positions  for 40 hours of work per week in tobacco and cucumbers from 4/15/05 to 11/15/05)

    f.   R3 05047 02285 (Win Farms – 13 positions for 40 hours of work per week in Asian vegetables from 4/1/05 to 12/31/05)

g. R3 05047 02287 (David Gene Turner – 30 positions for 40 hours of work per week in Asian vegetables from 4/15/05 to 11/15/05) R3 05047 02281 (Bill Freeman – 20 positions for 40 hours of work per week in tobacco and cucumbers from 4/15/05 to 11/15/05)

h. R3 05047 02277 (Greg Bunn – 40 positions for 40 hours of work per week in tobacco from 4/15/05 to 11/15/05)

i. R3 05047 02273 (Timmy McLamb – 28 positions for 40 hours of work per week in tobacco and sweet potatoes from 5/1/05 to 11/15/05)

142. U.S. Citizenship and Immigration Services ("USCIS") requires that each clearance order first be approved by the ETA before it will approve H-2A visas for the petitioning employer. Defendants Million USA, Homsombath, Raynor, and Chinlasith, through Defendant Homsombath's signature, swore to the promises in the clearance orders under penalty of perjury, pursuant to 28 U.S.C. §1746. The ETA approved Million USA's labor certification for work to be performed on the farm of several of the other farms listed in paragraph 142 of this Complaint.

143. Defendants Million USA, Homsombath, Raynor, and Chinlasith, through Defendant Homsombath knowingly and willfully made false assurances under penalty of perjury on those clearances orders. Defendants Million USA, Homsombath, Raynor, and Chinlasith knew the job offer's promises and assurances to be false at the time they signed the clearance orders.

144. Defendants Million USA, Homsombath, Raynor, and Chinlasith would not have been able to obtain visas for H-2A workers without making these false assurances, because the ETA would not approve the clearance orders had they stated the true nature of their Thai Labor Scheme.

145.  Defendants Million USA, Homsombath, Raynor, and Chinlasith never intended to comply with the assurances outlined in 20 C.F.R. § 655.103 and included in the clearance order. The false statements and broken promises contained in the clearance orders are set forth in paragraphs 38, 39, and 56 of this Complaint.

146.  Defendants Million USA, Homsombath, Raynor, and Chinlasith knowingly and willfully, under penalty of perjury, made the material false statements listed in paragraphs 38, 39, and 56 of this Complaint, and similar false statements, in clearance orders listed in paragraph 142 of this Complaint, in order to perpetrate their Thai Labor Scheme, in a manner that violated 18 U.S.C. §1546.

147.  Defendants Million USA, Homsombath, Raynor and Chinlasith's wrongful actions of visa fraud caused plaintiffs' economic injuries.

148. Each violation of 18 U.S.C. §1546 constitutes an act of racketeering activity under RICO, 18 U.S.C. §1961.

### 5.  Predicate Act:  Confiscation of Documents In Furtherance of Trafficking – 18 U.S.C. §1592

Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-148.

149. Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa knowingly confiscated or possessed plaintiffs' passports and other immigration documents in order to prevent or restrict or to attempt to prevent or restrict their liberty to move or travel and as a part of a scheme to traffic plaintiffs and force them to labor.

150.  Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa knowingly and willfully committed unlawful conduct with respect to these plaintiffs' passports

and visas in violation of 18 U.S.C. §1592, constituting racketeering activity as defined by RICO, 18 U.S.C. §1961(1).

151.   Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa's wrongful actions of confiscation of documents in furtherance of trafficking caused the plaintiffs' economic injuries.

### 6.  Predicate Act:  Forced Labor - – 18 U.S.C. §1589

Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1-151.

152. Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa knowingly provided or obtained the labor or services of plaintiffs by means of the threatened abuse of law or the legal process or through means of a scheme, plan or pattern intended to cause plaintiffs to believe that, if plaintiffs did not perform labor or services, plaintiffs would suffer serious harm or physical restraint.

153.   As set forth above, Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa knowingly and willfully committed acts of forced labor in violation of 18 U.S.C. §1589, constituting racketeering activity as defined by RICO, 18 U.S.C. §1961(1).

154.   Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa's wrongful actions of forced labor caused the Plaintiffs' economic injuries.

### 7.  Injury

155.   The RICO Defendants' racketeering activity has caused plaintiffs to be injured in their business or property as follows:

a.   Plaintiffs believed the misrepresentations made by RICO Defendants regarding the offer of employment in the United States. Relying on said false promises,

plaintiffs and other Thai workers paid over eleven thousand dollars ($11,000) each to Million Thailand and its agents;

b. plaintiffs were directly and proximately injured in their business and property by needing to travel between their home town and Bangkok repeatedly in order to secure the employment;

c. plaintiffs further suffered direct and proximate injury in their business and property when defendants confiscated their passports, visas, and return airplane tickets to prevent their escape; and

d. plaintiffs have been deprived of personal property, deprived of wages and other income for services actually performed, and otherwise injured in their business or property.

156. The RICO Defendants' unlawful conduct has allowed them to earn or retain significant funds to which they were not entitled.

## V.   FIRST CLAIM FOR RELIEF (Fair Labor Standards Act)

157. This claim arises under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. and is brought by all plaintiffs against defendants Million USA, Homsombath, Chinlasith, Evans Farms, Inc. and Harold Williamson.

158. Plaintiffs paid:

a. travel costs for multiple trips from their home villages to Bangkok to meet Defendant Million Thailand's application requirements;

b. travel costs for their journey from Bangkok to North Carolina;

c. their recruitment fees;

d. visa fees; and

e. entry document costs.

159. These expenses were primarily for the benefit of the plaintiffs' employers.

160. Plaintiffs never received reimbursement for any of these expenses.

161. As a result, Defendants Million USA, Homsombath, Chinlasith, Evans Farms, Inc. and Williamson failed to pay plaintiffs the minimum wage for all hours of work performed as required by 29 U.S.C. §206(a) and plaintiffs suffered damages.

## VI.    SECOND CLAIM FOR RELIEF (Trafficking In Persons)

162. This claim is brought by all plaintiffs pursuant to 18 U.S.C. §1595 against Defendants Million USA, Homsombath, Million Thailand, and Tsai Rong-Fa for violations of 18 U.S.C. § 1589 and §1590.

163. Defendants Million Thailand and Tsai Rong-Fa made fraudulent promises to the plaintiffs regarding the length of employment, the length of their visas, and their wages, and living and working conditions.

164. Defendants Million Thailand and Tsai Rong-Fa charged unconscionably large fees for their services to place plaintiffs in employment with H-2A visas in the United States.

165. These defendants knew the plaintiffs could only repay the loans necessary to raise the fees by working in the U.S. for an extended period of time and that plaintiffs utterly lacked the ability to repay the loans based upon their local wages in Thailand.

166. Defendants Million Thailand and Tsai Rong-Fa instructed the plaintiffs to deceive the consular officials at the U.S. Embassy and officials at the Thai Ministry of Labor regarding the fees charged by Million Thailand to place plaintiffs in the Million USA jobs.

167. Defendants Million Thailand and Tsai Rong-Fa attempted to extort more money for their fees from the plaintiffs prior to allowing the plaintiffs to leave Thailand on their approved

visas and, through this extortion attempt, enforced the confiscation of the plaintiffs' passports upon their arrival in the U.S.

168. Defendant Million Thailand threatened the plaintiffs' families in Thailand after the plaintiffs left the employ of Defendant Million USA.

169. Through these activities, Defendants Million Thailand and Tsai Rong-Fa knowingly provided the labor or services of the plaintiffs by:

    a.  threats of serious harm or physical restraint against the plaintiffs or their families; or

    b.  means of a scheme, plan, or pattern intended to cause the plaintiffs to believe that if they did not perform such labor or services, they or their families would suffer serious harm or physical restraint; or

    c.  means of the abuse or threatened abuse of law or the legal process against the plaintiffs or their families.

170. Defendants Million USA and Homsombath made fraudulent promises to the plaintiffs regarding the length of employment, the length of their visas, and their wages, and living and working conditions.

171. Defendants Million USA and Homsombath profited from the unconscionably large recruitment fees plaintiffs paid to Defendants Million Thailand and Tsai Rong-Fa in Thailand.

172. Defendants Million USA and Homsombath confiscated plaintiffs' passports to prevent them from leaving their employment.

173. Defendants Million USA and Homsombath threatened plaintiffs with arrest and immigration consequences if they left their employment. Defendants Million USA and

Homsombath also subjected plaintiffs to constant monitoring, including forcing plaintiffs to live in outbuildings behind Defendant Homsombath's personal residence.

174. Defendants Million USA and Homsombath failed to pay plaintiffs for their work in New Orleans, and subjected them to extremely substandard living conditions there, under constant supervision and threats.

175. Defendant Homsombath and his family members displayed guns to plaintiffs, causing them to fear for their safety.

176. Through these activities, Defendants Million USA and Homsombath knowingly provided or obtained the labor or services of the plaintiffs by:

    a. threats of serious harm or physical restraint against the plaintiffs or their families; or

    b. means of a scheme, plan, or pattern intended to cause the plaintiffs to believe that if they did not perform such labor or services, they or their families would suffer serious harm or physical restraint; or

    c. means of the abuse or threatened abuse of law or the legal process against the plaintiffs or their families.

177. As a result, plaintiffs suffered damages.

## VII.    THIRD CLAIM FOR RELIEF (RICO)

Plaintiffs reallege and incorporate herein by reference ¶¶1-177 of this Complaint.

178. Plaintiffs are entitled to bring suit under 18 U.S.C. §§ 1964(c) of the Racketeer Influenced and Corrupt Organizations Act. ("RICO").

179. This claim arises under RICO, 18 U.S.C. 1962(c), against the RICO Defendants Million USA, Homsombath, Raynor, Chinlasith, Million Thailand and Tsai Rong-Fa.

180. The RICO Defendants were employed by or associated with the MilEx Enterprise.

181. At all times relevant to this Complaint, the RICO Defendants were persons as defined in the RICO Act at 18 U.S.C. 1961(3).

182. At all times relevant to this Complaint, RICO Defendants Million USA, Homsombath, Raynor, and Chinlasith willfully and knowingly committed the following predicate acts: multiple acts of 18 U.S.C. §1546 (relating to fraud and misuse of visas, permits, and other documents).

183. At all times relevant to this complaint, RICO Defendants Million USA, Homsombath, Million Thailand and Tsai Rong-Fa willfully and knowingly committed the following predicate acts: 18 U.S.C. §1589 (relating to trafficking/forced labor); and 18 U.S.C. §1592 (relating confiscation of documents in furtherance of trafficking).

184. Defendants traveled in interstate commerce in furtherance of their unlawful scheme.

185. As a direct, intended and foreseeable result of the RICO Defendants' RICO violations, plaintiffs have suffered an identifiable and distinct injury or damages to their business or property.

186. As a result of the RICO Defendants' actions, plaintiffs suffered injuries and therefore request injunctive and declaratory relief and damages pursuant to 18 U.S.C. §1964.

187. 18 U.S.C. §1964 allows the civil plaintiff affected in his business and property by RICO violations to recover actual and treble damages and costs for violations of 18 U.S.C. §1962. §1962 allows damages against any person involved in a pattern of racketeering activity defined as any act included in 18 U.S.C. §1961(1).

## FOURTH CLAIM FOR RELIEF (Breach of Contract)

188.   This claim is brought by all plaintiffs against defendants Million USA, Million Thailand, Homsombath, Raynor, _Chinlasith, and arises under the common law of contracts.

189.   Defendants Million USA, Million Thailand, Homsombath, Raynor and Chinlasith formed a written contract with plaintiffs for work in the United States, referred to as the "Employment Contract" in this Complaint.

190.   In addition, by operation of law, all the terms and conditions in the approved clearance order ("the H-2A Contract") and the regulations, formed a contract between the plaintiffs and Million USA, Homsombath, Raynor, and Chinlasith.

191. Defendants Million USA, Million Thailand, Homsombath, Raynor,_and Chinlasith, violated the Employment Contract and the H-2A Contract, on which plaintiffs had relied, in a number of ways.  Defendants' broken promises included, among others:

    a.      not paying plaintiffs the adverse effect wage rate of $8.24 per hour for all hours worked;

    b.      not providing the period of employment promised in the H-2A Contract;

    c.      not providing forty (40) hours of work per week;

    d.      not providing plaintiffs with a minimum of three-fourths (¾) of the work days of the total specified period during which the work contract was in effect, as guaranteed by the H-2A Contract;

    e.      not paying plaintiffs weekly;

    g.      not providing three (3) meals per day nor "free and convenient cooking and kitchen facilities" for workers to prepare their own meals;

h.      not providing free housing that was in compliance with OSHA Housing Standards when occupied;

i.      not reimbursing plaintiffs for the cost of transportation, visa costs and subsistence from the place of recruitment;

192.    In addition, Defendants Million USA, Homsombath, Raynor, Chinlasith, and Million Thailand violated the Employment Contract and oral promises on which plaintiffs had relied in a number of ways.  Defendants' broken promises included, among others:

a.   not providing three years of employment as promised orally, nor nine months of employment, as promised in the Employment Contract;

b.   not paying "all necessary fees and expenses incurred on the acquisition of the work permit on the employee's behalf in accordance with local regulations" as specified by the Employment Contract;

c.   not taking "full responsibility" in repatriating the 'job seekers' (plaintiffs) as well as reimbursing the plaintiffs the paid service fee and expenses in any of the following situations when plaintiffs:

i.   were paid less than the agreed-upon wages;

ii.   were reassigned to a position other than that stipulated in the contract and did not wish to perform those duties;

iii.   were not granted the agreed-upon benefits; and

iv.   had their employment prematurely terminated.

d.   terminating the contract by telling plaintiffs no more work was available without giving one month notice to plaintiffs or paying one month's wages in lieu of giving notice; and not offering to pay cost of return travel to Thailand.

e. failing to comply with terms of the contract, but not taking responsibility for losses incurred to plaintiffs.

193. As a result of these breaches, plaintiffs suffered damages.

## VIII.   FIFTH CLAIM FOR RELIEF  (Misrepresentation)

194.  This claim is brought by all plaintiffs against Defendants Million Thailand, Million USA, Homsombath, Raynor, and Chinlasith and arises under the common law of torts.

195.  Defendants, personally and through their agents, made written and oral material misrepresentations to the plaintiffs in the course of recruiting them as H-2A workers for work with the defendants in the United States.   These misrepresentations included, among other things:

a. that plaintiffs would be provided lawful employment in the United States under H-2A visas;

b. that plaintiffs would be paid $8.24 per hour;

c. that plaintiffs would have forty (40) hours of work per week;

d. that defendants had already secured nine (9) months of work for the plaintiffs;

e. that defendants would secure other farm work for plaintiffs at the conclusion of the nine (9) months; and

f. that plaintiffs' visas would be renewed for a total of three (3) years.

196.  Defendants made these misrepresentations intending that the plaintiffs rely upon them in order to induce the plaintiffs to pay the exorbitant fees that they demanded.

197.  These representations were false and were known by defendants to be false at the time that the plaintiffs were recruited by defendants.

198.  In reliance upon defendants' misrepresentations, all plaintiffs paid large sums of money to defendants for their required fees, and, in order to pay these fees, nearly all plaintiffs borrowed the money at steep rates of interest, mortgaging their property or their family's property as security for the loans.

199.  As a result of defendants' misrepresentations, plaintiffs suffered damages.

## DEMAND FOR JURY TRIAL

200.  Plaintiffs demand trial by jury on all issues so triable.

## PRAYER FOR RELIEF

201.  Plaintiffs respectfully request that this Honorable Court enter an order:

a)  accepting jurisdiction of this cause;

b)  granting plaintiffs' demand for a jury trial;

c)  finding that defendants Million USA, Homsombath, Raynor, Chinlasith, Evans Farms, Inc. and Williamson violated the rights of the plaintiffs under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq* and are jointly and severally liable for such violations.;

d)  awarding plaintiffs damages equal to the amount of their unpaid minimum wage and an equal amount as liquidated damages pursuant to 20 U.S.C. § 216(b);

e)  finding that defendants Million Thailand and Tsai Rong-Fa violated the rights of the plaintiffs by knowingly providing them for forced labor in violation of 18 U.S.C. §§1589 and 1590 and are jointly and severally liable for such violations;

f)  finding that defendants Million USA and Homsombath violated the rights of the plaintiffs by knowingly providing or obtaining them for forced labor in violation of 18 U.S.C. §§1589 and 1590 and are jointly and severally liable for such violations;

g) awarding plaintiffs damages for the violations of their rights, pursuant to 18 U.S.C. §§1595;

h) finding that defendants Million Thailand, Tsai Rong-Fa, Million USA, Homsombath, Raynor and Chinlasith engaged in racketeering activity under the RICO in violation of plaintiffs' rights in violation of 18 U.S.C. §1962(c) and that they are jointly and severally liable for such violations;

i) Awarding plaintiffs treble damages for the violations of their rights under the RICO pursuant to 18 U.S.C. §1964(c);

j) Finding that Defendants Million USA, Homsombath, Raynor, and Chinlasith breached their contracts in the approved clearance order with the plaintiffs and are jointly and severally liable for such breach ;

k) Awarding plaintiffs damages for the breach of those contracts;

l) Finding that Defendants Million USA, Homsombath, Raynor, Chinlasith, and Million Thailand breached their oral and written contracts, including the Employment Contract, with the plaintiffs and are jointly and severally liable for such breach;

m) Awarding plaintiffs damages for the breach of those contracts;

n) Finding that Defendants Million USA, Homsombath, Raynor, Chinlasith, and Million Thailand made material misrepresentations to the plaintiffs and are jointly and severally liable for such misrepresentations;

o) Awarding plaintiffs actual and punitive damages for those misrepresentations;

p) Enjoining all defendants from engaging in the violations of law alleged herein; and

q) Granting such other relief as may be just and proper.

Respectfully Submitted,

/s/ Mary Lee Hall
_____
Mary Lee Hall
N.C. State Bar # 16347

/s/ Lori Elmer
_____
Lori Elmer
N.C. State Bar # 24227

and

/s/ Katharine Woomer-Deters
_____
Katharine Woomer-Deters
N.C. State Bar # 33892

Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Tel. (919) 856-2180
Fax (919) 856-2187
Attorneys for Plaintiffs


Dated August 24, 2007

## CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the foregoing Amended Complaint was

served by U.S. mail, first class postage prepaid, upon all Defendants as follows:


Million Express Manpower, Ltd.
1499 Soi Latpao 94 Sriwa Street
Wangthonglang Sub-District
Wangthonglang District, Bangkok 10310
THAILAND

Tsai Rong-Fa
Million Express Co. Ltd
1499 Soi Latpao 94 Sriwa Street
Wangthonglang Sub-District
Wangthonglang District, Bangkok 10310
THAILAND

The two new defendants will be served with a summons when it is issued.

This the 24th day of August, 2007.

/s/ Mary Lee Hall
Mary Lee Hall
N.C. State Bar # 16347


Legal Aid of North Carolina
Farmworker Unit
P.O. Box 26626
Raleigh, NC 27611
Tel. (919) 856-2180
Fax (919) 856-2187
Attorney for Plaintiffs

46